## Gilley v. Commonwealth.

Nov. 3, 1939.

T. E. Mahan, J. C. Bird, A. M. Caddell and Lee Brown for appellant.

Hubert Meredith, Attorney General, and A. E. Funk, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Reversing.

On September 19, 1938, the grand jury of Whitley County returned a true bill charging appellant with the crime of rape upon Gracie Lee Partin, a female above the age of twelve and under the age of sixteen. Kentucky Statutes, Section 1155. At the conclusion of the trial, begun on September 30, 1938, the jury returned a verdict of guilty and inflicted the death penalty. Motion for a new trial was overruled and judgment entered.

In his motion for a new trial appellant advanced six grounds in support thereof, but in brief the following grounds for reversal are urged:

"(1) The record discloses no evidence which showed the alleged offense to have been committed in Whitley County, or any circumstances from which venue could be reasonably inferred.

"(2) Because the court failed to give the whole law of the case by his failure to instruct on attempted rape, which is a common law misdemeanor (Kitchen v. Com., 275 Ky. 564, 122 S. W. (2d) 121) or, under Section 1155, Kentucky Statutes, which denounces the offense (subsec. 2) of carnally knowing a female who is above the age of 12 and under the age of 16, with consent.

"(3) Misconduct of the commonwealth's attorney in persistently asking incompetent questions after the court had sustained objections."

Prosecutrix and her grandmother testified that she was fourteen years of age; there is no dispute on this point. The girl's father was living, her mother dead; she had been living with her grandmother since she was eight months old.

Prior to June 3, 1938, the day the offense was committed, prosecutrix had never seen appellant but once, and did not then learn his name. Testifying, she says

that on the date named, and after 5 P. M. she left her grandmother's to do the milking. She went to the milk gap, which was about 60 yards from their home. She says she did not see appellant, nor had she seen him that day, although he had been to the Owens' home, and the home of a neighbor. She testifies as follows:

"I was milking; this man came up behind me and grabbed me by the back of the neck and put the other hand in my mouth. He took me up the holler out of sight of the house in a sink hole. I hollered just a little, but he put his hand in my mouth. He had hold of my hand this way, and one hand in my mouth. He put me on my back and pulled my clothes up and *misintreated* me. He held me by my wrist with one hand and pulled my clothes up with the other. I hollered about three times for Will."

Will was a relative and testifies that he had been hunting that day; that after he returned home he found his "granny" worried because Gracie had not returned from the milk gap. He said that "granny had been calling her, but received no answer;" that she sent him up to the gap and he found the milk bucket overturned, the milk spilled on the ground. He went back and reported that Gracie was not at the gap. Later he and another person began to look for her. At one time, not definitely fixed, he called Gracie and she answered, "Come to me Will." Later a party was formed and search made for the girl, without result.

We have interpolated the above merely to show that the girl's story was to some extent corroborated, and we note from a reading of appellant's testimony that he in part corroborates this testimony.

Resuming her testimony, she further said that appellant "kept me up on the mountain from 5:30 p. m. til about eleven or eleven-thirty o'clock." In this particular she is perhaps mistaken, since other proof shows that she finally got back to her grandmother's home about 9:30. Under the testimony related by her it may be conceived that the time seemed much longer than would appear under ordinary circumstances. However, we do not treat the discrepancy to be of more than minor importance. She relates that after appellant had accomplished his designs, some two or three times, she got her hand loose and hit him with a rock and hurried back home.

In detailing just what occurred during the time, she says she was kept in the "holler" up the mountain side. She said that appellant had his person about her private parts; that what he did was painful to her, and that there was nothing she could do to prevent him from carrying out his purpose. She said her neck, arms and legs were bruised and scratched, and that during the time she was held up on the mountain side, appellant had intercourse with her "three or four times." Asked the particular question as to whether appellant's privates entered, she said, "Yes, sir, sure did." When asked whether or not there were other hurts inflicted on her, she said: "It was right down here" (indicating lower private parts), which she said "hurt worse" than the other injuries.

Counsel for appellant, in a well prepared argument, insists that Gracie's story was improbable, but as we look carefully at the record we are not impressed with the suggested improbability. She was put through a grilling cross-examination, and held her ground well. Her cross-examination furnishes the basis, as appellant sees it, for some criticism of her testimony.

The testimony, to which we refer, related directly as to what happened after appellant had, as she says, taken her up to the "sink hole." She more minutely describes how appellant held her by the back of the neck, threatened her and put his fingers in her mouth when she "hollered," and how he pushed her from the milk gap "until he got me where he wanted me." She tried to bite his fingers, but says she could not as he had his "fingers bearing down on my mouth."

She says it was 200 or 250 yards from the milk gap to the sink hole, and 50 or 60 yards from the milk gap to the Owens' home. She relates: "Just as quick as he got me there he grabbed me and throwed me down." Asked, "You don't tell this jury his private parts entered you, do you? A. Yes, sir, I think they did." By the Court: "Do you know whether or not his private parts entered you? A. Yes, sir, they did." By the Court: "You still say you think they did? A. Yes, sir." On redirect examination the following occurred:

"Q. With reference there at the time he had you down, you said he mistreated you about three times; tell the jury whether or not any of these times you could tell his private parts entered into

your private parts? Defendant objects. By the Court: "Give your best judgment. A. Yes, sir. Q. It did? A. Yes, sir."

Prosecutrix says when she got home, after a searching party had failed to find her, her grandmother asked her where she had been and she told her, "A man grabbed me around the neck when I was milking and choked me so I couldn't call you, and took me up on the mountain and *misintreated* me." She told her the man took her bloomers off. The grandmother described the scratches and bruises on the body of prosecutrix, and said she was much excited; that "she looked like she had been wallowed in the mud." The bloomers were not found until the next day, and the grandmother says "they were torn all to pieces." The grandmother, who said she was familiar with secretions and discharges resulting from sexual intercourse, said, "There was lots of it on her bloomers as well as several drops of blood." The bloomers were not exhibited. The grandmother says she kept them for a while, but they became so foul that she destroyed them.

Five days after the occurrence prosecutrix was examined by Doctors Moss and Croley. Dr. Moss described evidences of a cut on the side of her lip; bruised places on her right arm; bruised places on her legs, and bruises and finger prints on her neck, and black places on both legs. "An examination of the hymen showed signs of recent injury tear," which he said might have been caused by "penetration in sexual intercourse." The doctor would not say, nor could he say except from related history, that the injury to the hymen was the result of an act of intercourse. On cross-examination the doctor said he could not say positively what caused the injury, which he later described as a tear of the hymen and a slight discharge.

Dr. Croley described the bruises and marks on prosecutrix' body as had Dr. Moss, and further said: "The hymen showed evidence of injury; it looked like a slight tear, and a slight discharge along with that," which laceration, as he said, could have been caused by the sexual act. He said the hymen was a membrane about one inch from the outside.

Appellant's version of what happened on the occasion (admitting he had been in the "holler" with prosecutrix) is not, to say the most of it, impressive. It does

not bear the ring of truth, and evidently the jury so thought, since they inflicted the severest penalty provided for such offenses. He stated that he was a coal miner, 39 years of age, married, with four children. At the time of the occurrence he lived at Gatliff, a mining town in Whitley County. He lived "across the mountain" from where the prosecutrix lived. The distance from Gatliff to Poplar Creek, where she lived, was about 2¼ to 2½ miles.

Appellant relates that he left home at 3:30 or 4 A. M. Friday, to go across the mountain to Poplar Creek to get some moonshine liquor. He had made the trip, as he says, three of four times previously for a like purpose. At some time in the morning he procured four quarts of whiskey; he, and perhaps others, had drunk one quart. He was at the Reynolds' home as early as six o'clock.

Later, while at the Reynolds' home, he says that one of the girls told him that she had "made a date" for prosecutrix to meet Isaac Shelton. Why this matter came up is not shown. The Reynolds' girl denied any such conversation. Appellant left the Reynolds' home, which was about 250 yards from the Owens' home, and returned about noon and ate dinner. He says he had been drinking "pretty heavily." Later in the afternoon he went to the Owens' home, and talked to some member of the family (not prosecutrix) about a dog. He says he had his liquor in quart jars in a sack, and had hidden it in a fence corner before going to the Owens' home. Going again toward the Reynolds' home he discovered that some one had taken his whiskey. He searched for some time without success, and finally went to sleep by the side of the path, about halfway between the Owens' and Reynolds' homes. He doesn't say how long he slept, but was finally awakened by "this little girl slapping me on the head, and she said 'what are you doing here asleep?' she woke me up and said, 'you got a date with Ruth?' I said 'No.' She says, 'I know you got a date, you not been quarreling?' I said, 'I aint got no date, how about a date with you?' and she said 'all right.' She said, 'You go up the holler and wait for me above the bend, and I will be up there.' I went on up there before her and waited, and she came on up the holler where I was, just above the bend."

At this point in his direct testimony, he denies each

and every assertion made by the little girl with reference to what transpired from the time she says he grabbed her at the milk-gap and took her up the mountain side. He then drops back to his version of what occurred. He says the girl, after she got above the bend, led the way up the "holler" and the hill into the sink hole, described by prosecutrix, she getting there first. He then specifically denies what the girl said had taken place in the sink hole. He says he remained there with the girl something like thirty or forty minutes. They discussed the subject of sexual intercourse, and he says:

"Well, when we first got up there, according to my understanding with her, I was aiming to give her a dollar. I had a dollar. She pulled her bloomers off and laid down. I got to where she was at. She said I had to give her some more money. I told her I didn't have any more money. She told me, 'If you do that you are going to pay me $20.00.' I said, 'I am not paying you $20.00; I haven't got it.' She said, 'You'll wish you had,' and after that she tore her bloomers off, and tore them up and threw them in my face. About that time some one out at the barn went and called this girl. I told her she had better go to the house. She said, 'I am afraid to go to the house, if I go to the house now they will whip me; if I had the money I would leave here. I don't aim to stay in this holler all my life.' "

He then says he left, leaving the girl standing there, and started home, "up around the side of the hill, across the bottom back of the Owens' house," and got in the path that led to Gatliff, where he lived, and arrived home about 8:30 P. M.

This occurrence took place on Friday evening. On Saturday appellant heard that officers were looking for him, supposedly for "liquor or being drunk." On Sunday morning he heard that he was wanted on a rape charge, and that friends or relatives of the girl were going to "kill the man." He was at home at that time, but went back "up on the hill," and then to the top of the mountain, where he remained until about 3:30 P. M. on Sunday. He then left to go to relatives on Wolf Creek.

Appellant says the trip from the "sink hole" to his

home covered four or five miles, and it took him about two hours to make it. In going to Wolf Creek, he went to the top of the mountain at Gatliff, and came into the highway at Packard, which he says was the most difficult way. He got to his relatives' home early Tuesday morning.

Under a severe cross-examination appellant elaborated somewhat on his version as given on direct. Still insisting that he did not force prosecutrix to go up the "holler to the sink hole," he said after they got up there he "rubbed up—hugged her up there a little." We quote some of his testimony:

"Q. If I understand, you was hugging her to have intercourse with her? A. I guess that was it.

"Q. That was the purpose of rubbing her things like that—that right? A. Yes, sir.

"Q. You pulled up her dress? A. Yes.

"Q. What did you do? A. Nothing.

"Q. How close were you to her? A. Down below her to one side of her.

"Q. After she was getting ready to perform the act of intercourse, and had agreed, you wasn't getting ready at all? A. When I started she objected. When I went to unbutton my pants she asked me how much money I had."

Appellant, offered no further witnesses, save four neighbors living in Gatliff, introduced as character witnesses. The testimony of these witnesses was not of impressive quality. Some of them were compelled to say that in some respects his reputation was not good. He was a liquor drinker and was known as a fighter. Some went so far as to say that since the June 3d occurrence they had heard that he had been guilty of committing a similar offense in Illinois.

Gracie Partin was called in rebuttal and emphatically denied the statements made by appellant, as to what he said had occurred in going to and after reaching the sink hole.

With the foregoing statement of proof we take up the several contentions urged for reversal, not in the order as set out supra. It is contended that appellant's rights were prejudiced because the commonwealth's offi-

cers persisted in asking impertinent questions after the court had sustained objections. We find, as suggested, that the prosecuting officers pressed some immaterial and, perhaps, irrelevant questions, one as to his purchase of liquor, where he obtained the money; others as to appellant's notion that prosecutrix appeared to him to be a grown woman. We find nothing in the colloquies which would prejudice his substantial rights.

Coming now to the objection that venue was not properly laid, we find that it is true that no witness testified explicity that the occurrence took place in Whitley County, hence appellant contends venue was not proven, and relies mainly on the case of Wilkey v. Com., 104 Ky. 325, 47 S. W. 219, 20 Ky. Law Rep. 578, in which it was held that proof that the crime was committed in "Rhea's" wheatfield, about 400 yards distant from the residence of Joe Tyree," was insufficient. This case has been referred to in almost every case since it was written where the question was raised.

In Nelson v. Com., 232 Ky. 568, 24 S. W. (2d) 276, 277, the Wilkey case is referred to, and we said:

"While the jury is not presumed to know the location of particular homes, * * * it is presumed to have some knowledge of local geography, such as the location of towns, precincts, creeks, and the like." (citing specific instances.) "The rule is that it is not necessary to show by direct evidence that the crime occurred in the county, but this may be shown by facts and circumstances from which it may be inferred."

Here the proof showed that the offense was committed within a few hundred yards of the Owens' home, which, one witness testified, was in Whitley. Appellant lived in Whitley, a few miles from the Owens' home. This proof was sufficient to fix venue, as we have held in Slone v. Com., 246 Ky. 853, 55 S. W. (2d) 1113; Hale v. Com., 269 Ky. 743, 108 S. W. (2d) 716, and the Nelson case, supra. Compare these with the Wilkey case supra.

The concluding argument is that the court did not give the whole law of the case, as indicated supra. The court instructed on every possible phase of the law relating to this character of cases, save on the penalty for attempted rape, and under Section 1155, Kentucky Statutes, where consent is an element.

In Kitchen v. Com., 275 Ky. 564, 122 S. W. (2d) 121, 123, it appears that Kitchen was first indicted for the offense denounced by Section 1155, Kentucky Statutes. Upon examination of the person of the girl the doctors reported that in their judgment there had been no penetration. A new indictment was returned charging the crime to have been committed by force, as opined for the evident purpose, "to entitle the Commonwealth to an instruction on detaining a woman against her will," an offense which is denounced by statute (Section 1158) and a lesser degree of rape as denounced in Section 1154, which instruction the commonwealth could not have obtained under an indictment charging the crime under Section 1155. Blankenship v. Com., 234 Ky. 531, 28 S. W. (2d) 774. We indicated in that case that the court below, because of the "unusual circumstances" surrounding the alleged crime, justified the giving of an instruction on attempt to rape and detaining a female.

In Mosely v. Com., 206 Ky. 173, 266 S. W. 1048, 1049, the prosecutrix was about thirteen years of age, and the charge was rape. The examining physician could not say whether or not there had been penetration, but was sure there had not been intercourse. The girl did not know whether there had been penetration or not. Only two instructions were given. One upon rape; the other on reasonable doubt. We said:

"The evidence for the commonwealth does not satisfactorily prove a case of rape because it is very doubtful whether there was penetration. Penetration is essential to the crime, but may be proved or disproved by circumstances."

However we found [from the prosecution's evidence, which is not detailed] that appellant was guilty of an attempt to commit the crime.

We reversed the case and directed the court to instruct "upon the whole law applicable to the crime of rape and all of its degrees." The court said: "Instructions upon the crime of rape, attempt at rape, and unlawfully detaining a woman against her will," should have been given.

In the frequently quoted case of Nider v. Com., 140 Ky. 684, 131 S. W. 1024, 1025, Ann. Cas. 1913E, 1246, it appeared that appellant was indicted under Section

1155, Kentucky Statutes (as it then read, 1910); we reversed the case because there was insufficient proof to show rape; there was proof to show an attempt to commit the offense, and we suggested that such an instruction should be given on remand of the case. The facts upon which the court concluded that there was sufficient proof of an attempt are not detailed. The court did say:

> "It is indispensable to sustain a conviction under this statute that there should be some evidence of penetration, however slight.   *   *   *   But there is no evidence in the record in support of this vital point   *   *   *   There [is], however, sufficient evidence to sustain a conviction for the attempt to have carnal knowledge of the prosecutrix if the attempt to commit this crime is punishable."

The court then, in an elaborate review of the common, and our statutory law, concluded that the attempt was punishable. We need not go further into the detailed discussion, but agree that the court was correct in its conclusion.

The court, also, in the Nider case, supra, went to some extent in pointing out what constitutes an attempt, as distinguished from "solicitation," "intent," or "preparation." As we said, rather unfortunately we did not set out, even briefly, the facts which the court concluded constituted an attempt. It was pointed out that the authorities "are in substantial agreement as to the essential things necessary to constitute an attempt, although they differ in the form of expression." The writer cited Bishop's Criminal Law, Vol. 1, Section 755; Wharton's Criminal Law, Vol. 1, Section 173; Clark's Criminal Law, Section 126; 12 Cyc. 176, 3 Am. & Eng. Ency. of Law, p. 250. The law may be thus stated:

> "There must be an overt act, State v. Thomason [23 Okl. Cr. 104] 212 P. 1026; and the overt act must be sufficiently proximate to the intended crime to form one of the natural series of acts which the intent requires for its full execution. Com. v. Eagan, 190 Pa. 10, 42 A. 374. There must be an act done which more or less directly tends to the commission of the crime. Leverett v. State [20 Ga. App. 748] 93 S. E. 232. There must be an act in part execution of the crime, Nider v. Com., supra." Cr. to Ky. L. J., Vol. 21, Jan. 1933, p. 95.

Without reciting the facts detailed in some of our decisions, wherein the court determined whether or not the proof of "attempt" was sufficient to support a verdict where that offense was charged, or included, we refer the reader to Burch v. Com., 240 Ky. 519, 42 S. W. (2d) 714; Payne v. Com., 110 S. W. 311, 33 Ky. Law Rep. 229; Page v. Com., 219 Ky. 151, 292 S. W. 741; Vaughn v. Com., 262 Ky. 588, 90 S. W. (2d) 1037; Wright v. Com., 267 Ky. 441, 102 S. W. (2d) 376, and the Kitchen case, supra.

A reading of those cases has convinced us that here there was sufficient proof of attempt to have justified the court in giving an instruction on the common law offense, of attempted rape, which as we said in Kitchen v. Com., supra, and Nider v. Com., supra, is a misdemeanor.

From the unusual circumstances surrounding the case, and the trend which the testimony took, we are also of the opinion that the court should have instructed under Section 1155, Kentucky Statutes, which denounces the offense of carnally knowing a female within the age limits fixed, and with her consent; that the offense denounced therein is a lesser degree of the crime of rape by force, there is no longer doubt. See cases above cited, and Prewitt v. Com., 248 Ky. 845, 60 S. W. (2d) 122, in which case the indictment charged and accused was convicted for forcible rape on a female under the age of sixteen.

We held in that case that the verdict was sustained by the evidence, but reversed because the court, though giving an instruction under Section 1155, Kentucky Statutes, omitted the giving of the "doubt of degree" instruction, but specifically held that an offense under Section 1155 was a degree of the greater offense of rape by force. See also Fletcher v. Com., 250 Ky. 597, 63 S W. (2d) 780; Hodge v. Com., 245 Ky. 1, 53 S. W. (2d) 186; Blankenship v. Com., 234 Ky. 531, 28 S. W. (2d) 774. See contra, Dalrymple v. Com., 215 Ky. 25, 284 S. W. 104; Young v. Com., 96 Ky. 573, 29 S. W. 439, 16 Ky. Law Rep. 496; Adams v. Com., 219 Ky. 711, 294 S. W. 151.

The girl's testimony was to the effect that she was forced and compelled to go up on the mountain side, and there forced to submit to the purposes of the accused. On the other hand he says that the jour-

ney to the sink hole, and everything that occurred there, was at the suggestion of prosecutrix and therefore with her consent.

The jury believed the girl's version of the transaction, i. e., that what was done was done by force. Under the statute, if the jury had come to the conclusion that the act was done, but with her consent, then the lesser penalty could or should have been inflicted.

In Dunn v. Com., 193 Ky. 842, 843, 237 S. W. 1072, the prosecutrix testified to facts which clearly showed that accused was guilty of rape by force and against her will. The accused admitted that he had been in company with the prosecutrix prior to the time of the offense, charged to have been committed; that he had talked to her, and had "put her out at Matherly's gate," saying why she was put out there, but denied having done the criminal act of which he was accused.

In that case the court gave an instruction under Section 1155, Kentucky Statutes, and appellant was found guilty and given ten years' confinement in the penitentiary. He was here complaining strenuously that the court had erroneously given an instruction under Section 1155, because, as he insisted, "there was no evidence that the intercourse, if it occurred, was with the consent of the prosecuting witness." In answer to his contention we said:

"Indeed, if the court had failed to give the instruction complained of and defendant had received the death penalty, and was here now seeking a reversal because of such failure, it would be our bounden duty to reverse the judgment because of failure to give to the jury the whole law of the case, since, as we have seen, the offense submitted in that instruction is a degree of and a lesser one than that for which defendant was indicted."

Solely because of the failure of the trial court to embody in his instructions one covering the offense of attempted rape, and another under Section 1155, Kentucky Statutes, the judgment is reversed for a new trial consistent herewith.